McEvoy Daniels & Darcy,
4560 East Camp Lowell Drive
Tucson, Arizona 85712
Telephone: (520) 326-0133
Fax: (520) 326-5938

Sally M. Darcy
darcysm@aol.com
Attorney for Trustee

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Proceeding |
| | ) | |
| MCMAHON PROPERTIES, LLC, | ) | Case No. 4-14-bk-00092-BMW |
| | ) | |
| | ) | **TRUSTEE'S MOTION TO SELL** |
| | ) | **PROPERTY OF THE ESTATE** |
| | ) | **FREE AND CLEAR OF ALL LIENS** |
| | ) | **AND CLAIMS PURSUANT TO** |
| Debtor. | ) | **11 U.S.C. 363** |
| | ) | |

Christopher Linscott, duly appointed Chapter 11 Trustee ("Trustee") in the above captioned case, moves this Court for an Order authorizing him to sell assets of McMahon Properties, LLC ("Debtor"), free and clear of liens and claims, as more fully set forth below.

**BACKGROUND**

Debtor is an Arizona limited liability company. Its members are identified as Robert McMahon ("McMahon") and his wife, Danita McMahon. According to McMahon, the Debtor was formed as a limited liability company in 1997.

On January 3, 2014, the Debtor filed its petition under Chapter 11 of the Bankruptcy Code. On April 30, 2014, the Order appointing Christopher Linscott as the Trustee for the Debtor's Estate was entered.

McMahon initiated several other Chapter 11 bankruptcies for related entities:

| Entity | Date Filed | Status |
|---|---|---|
| McMahon's Steakhouse, LLC | January 31, 2014 | Chapter 11 |
| Old Pueblo Grill, LLC | January 31, 2014 | Chapter 11 |

| | | |
|---|---|---|
| Metro Restaurants, Inc. | January 31, 2014 | Converted |
| Metropolitan Grill, LLC | January 31, 2014 | Converted |
| Robert and Danita McMahon | January 22, 2015 | Chapter 11 |

The Debtor owns a 75% membership interest in 60 North Alvernon, LLC, an Arizona limited liability company (the "Company"). The Company owns real property which is located at 60 N. Alvernon Way, Tucson, Arizona which is improved as a restaurant (the "Company Property"), and is currently occupied by Old Pueblo Grill, a Chapter 11 entity related to the Debtor. The legal description of the Company Property is attached hereto as Exhibit "1."

According to the Company's Operating Agreement:

> If the Company receives a bona fide offer from a third party to purchase the entire Company Property, and the Company chooses not to sell the Company Property for any reason, then a Member may put his Interest in the Company to the Company or the other Members based on a pro rata basis, and the Company, or the Members, shall be obligated to purchase that Member's Interest. [See the Operating Agreement, attached hereto as Exhibit "2," at page 22, ¶ 7.4(a)]

> The purchase price for such interest shall be the bona fide offer price allocable thereto. Such purchase price shall be paid in accordance with the terms set forth in the bona fide offer. [*Id.* at ¶ 7.4(b)]

The Company's only business is to own the Company Property. It is a single asset entity. Old Pueblo Grill pays the obligations relating to the Company Property. The members of the Company are the Debtor (75%), CFAM Properties, LLC (12.5%) and MHOPG, LLC (12.5%).

McMahon has provided a copy of the promissory note payable to Vantage West Credit Union ("Vantage West") dated May 14, 2010, in the face amount of $875,000.00 ("Note"), payment of which is secured by the Company Property. The makers of the Note include the Company, the Debtor, Old Pueblo Grill and Robert and Danita McMahon. McMahon failed to include this obligation on the schedules filed for the Debtor, Old Pueblo Grill and Robert and Danita McMahon. Upon information and belief, the balance due Vantage West, is approximately $793,000.00, plus real property taxes in the approximate amount of $70,000.00.

- 2 -

1    In addition, McMahon has attempted to adversely effect the value of the Company

2    Property. Without the knowledge or consent of the Trustee, the Company, through McMahon,

3    purportedly entered into an Amendment to Lease on December 1, 2014, retroactively reducing the

4    monthly rent to be paid by Old Pueblo Grill from $15,297.00/month to $8,000.00/month. The

5    Trustee asserts that this is an avoidable action, and that the lease between the Company and Old

6    Pueblo Grill is a month to month lease as it terminated pursuant to statute when it was not assumed.

7    The termination of the lease is a condition of the Purchaser to closing this transaction.

8    The Trustee has received an offer from a third party to purchase the Company Property which

9    is detailed below.

10   **THE OFFER**

11   The Trustee has received an offer from El Encanto Partners, LLC, an Arizona limited liability

12   company ("Purchaser"), through its authorized Member/Manager, Jay Zucker, to purchase the

13   Company Property for $1,150,000.00, cash at closing, ( the "Offer") **"AS IS,"** subject to Bankruptcy

14   Court approval. The sale shall be free and clear of liens and encumbrances, the liens and

15   encumbrances to be paid from the sale proceeds at closing. There will be no commission paid on

16   this transaction. The Purchaser understands that the Offer may be subject to higher bids. The sale

17   shall be for $1,150,000.00, cash at closing, or such other bid as the Court may approve ("Sales

18   Price"). Customary closing costs will be prorated and paid at closing.

19   Within three business days of the filing of this Motion, the Purchaser shall provide the

20   Trustee with a refundable deposit of $25,000.00 (the "Deposit") which shall be applied to the

21   purchase price at closing.

22   The sale is also contingent on the Trustee's review and approval of the liens and

23   encumbrances to be paid at closing.

24   The Offer is contingent on the Purchaser having the ability to inspect the Company Property

25   to perform its due diligence with reasonable access to be provided to the Purchaser during non-

26   business hours. Old Pueblo Grill and/or the Company has declined to allow an inspection by the

27   Purchaser. The due diligence period will commence on the date the Purchaser is allowed to

28   commence inspection of the Company Property. The Purchaser shall have 15 days in which to

- 3 -

1  complete his due diligence. The closing shall occur on the 15th day after the Order is entered

2  approving the sale, or earlier if the Court so authorizes.

3  Other persons desiring to bid on the Company Property must provide the Trustee with a

4  cashier's check in the amount of $25,000.00 before bidding begins. The cashier's check will be

5  returned to the unsuccessful bidders. The successful bidder's cashier's check will become non-

6  refundable at the close of the bidding and shall be applied to the Sales Price.

7  **LEGAL ARGUMENT**

8  Section 541 of the Bankruptcy Code defines "property of the estate" as " all legal or equitable

9  interest of the debtor in property as of the commencement of the case." Section 541(c)(1) further

10  provides:

11  Except as provided in paragraph (2) of the subsection, an interest of the debtor in

12  property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of

13  this section notwithstanding any provision in an agreement, transfer instrument, or

14  applicable nonbankruptcy law–

15  (A) that restricts or conditions transfer of such interest by the debtor; or

16  (B) that is conditioned on the insolvency or financial condition of the debtor

17  or the commencement of a case under this title or on the appointment of or

18  taking possession by a trustee in a case under this title or a custodian before

19  such commencement, and that effects or gives an option to offset a forfeiture,

20  modification, or termination of the debtor's interest in property.

21  A debtor's membership interest in a limited liability company is property of the bankruptcy

22  estate. *In re B&M Land and Livestock*, 498 B.R. 262, 266 (Bankr. Nev. 2013). As that court stated:

23  ". . . no case law suggests that a trustee must overcome any state or contract law

24  restriction on the corporation before obtaining the full rights and interests that the

25  debtor had possessed. This principle may be limited where the LLC is run by or

26  deals with matters such as professional practices or personal services. For instance,

27  a trustee likely may not manage a law firm medical practice, or accounting firm that

28  is organized as an LLC. Review of these cases raised by the parties before this Court

- 4 -

finds the proposition that the trustee's administration includes the right to control the LLC where a debtor owns an interest in an ordinary LLC and the debtor's bankruptcy estate is subject to administration by a trustee." *Id.* at 267.

A.R.S. § 29-732(A) provides that an interest in a limited liability company is personal property. To the extent the Company's Operating Agreement, attempts to restrict transfers, bankruptcy law, and specifically, Section 541, pre-empts state law, and a debtor's legal and equitable interests become property of the estate. *B & M Land and Livestock LLC, 498 B.R. 262 (Bankr. D. Nev. 2013).* Section 541(c)(1)(A) "overrides both contract and state law restrictions on the transfers or assignment of debtors' interest in a limited liability company to sweep all of their interest into their estate." *Fursman v. Ulrich (In re First Prot. Inc.),* 440 B.R. 821 (9th Cir. BAP 2010). In obtaining a debtor's rights in a limited company, the trustee is not a mere assignee, but steps into the debtor's shoes as to all rights. *Id.*

This was further acknowledged by the court in *In re Garbinski,* 465 B.R. 423, 426-427 (Bankr. WD Pa, 2012, where it stated:

> The cases are pretty clear that Section 541(c)(1) acts to override any provision of state law that would other wise limit or restrict a trustee with respect to a debtor's limited liability or limited partnership interests. In other words, any attempt to invoke state law to treat a trustee as a mere "assignee," who does not enjoy any management rights in the LLC or partnership entities, fails as a result of Section 541(c)(1).

Here, the Trustee, standing in the Debtor's shoes, pursuant to the Company's Operating Agreement, has brought an offer to the Company for the sale of the Company Property. The Company can agree to the sale, or the other members can pay the Trustee what he would receive if the sale was accepted. In this instance, based on the Offer, the Trustee estimates that he would receive approximately $200,000.00. Upon information and belief, the majority of members in the Company support the sale.

Pursuant to Section 363 of the Bankruptcy Code, the Trustee may sell property of the Estate with Court approval. The Trustee believes the Offer is in the best interest of the Estate.

- 5 -

1    The sale of the Company Property will benefit, not only the Debtor's estate with funds to pay

2    claims, but also the estates of Old Pueblo Grill, the McMahons, and Metro Restaurants by paying

3    the claim of Vantage West in full.

4    Wherefore, the Trustee respectfully requests that his motion to sell the Company Property

5    be approved.

6    RESPECTFULLY SUBMITTED this 7th day of April, 2015.

7    McEVOY, DANIELS & DARCY, P.C.

8

9    By: /s/Sally M. Darcy
                 Sally M. Darcy
                 Attorney for Trustee

10   **ACCEPTED AND APPROVED:**

11   /s/James M. Sakrison
     James M. Sakrison

12   Slutes, Sakrison & Rogers, PC
     Attorney for El Encanto Partners, LLC

13   and Jay Zucker

14   Copy of the foregoing mailed this
     7th day of April, 2015, to:

15

16   60 North Alvernon, LLC
     4644 East Fort Lowell Road
     Tucson, Arizona 85712-1111

17

18   McMahon Properties
     4644 East Fort Lowell Road
     Tucson, Arizona 85712-1111

19   Member

20   CFAM Properties, LLC
     5040 E. St. Andrews Drive

21   Tucson Arizona 85718
     Member

22

23   MHOPG, LLC
     c/o Don Martin
     3371 E. Hemisphere Loop

24   Tucson, Arizona 85706
     Member

25

26   Vantage West Credit Union
     Business Lending & Services
     PO Box 15115

27   Tucson, Arizona 85708

28

- 6 -

1 | Grant Winston
Pima County Attorneys Office
2 | Civil Division
32 N. Stone Ave., #2100
3 | Tucson, Arizona 85701-1412

4 | Scott Gibson
Law Office of Scott D. Gibson, PLLC
5 | 2329 N. Tucson Blvd.
Tucson, Arizona 85716
6 | Attorney for McMahon Properties,
Old Pueblo Grill, Metro Restaurants, Inc.
7 |
Adam B. Nach
8 | Lane & Nach, P.C.
2001 East Campbell Avenue, Suite 103
9 | Phoenix, Arizona 85016
Attorneys for Gayle Mills, Chapter 7 Trustee
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# EXHIBIT "1"

# EXHIBIT A
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF PIMA, STATE OF ARIZONA AND IS DESCRIBED AS FOLLOWS:

Lots 3, 4 and 5, in Block 13, of COUNTRY CLUB HEIGHTS, a subdivision of Pima County, Arizona, according to the map or plat thereof of record in the office of the County Recorder of Pima County, Arizona, in Book 4 of Maps and Plats at Page 27 and Book 5 of Maps and Plats at Page 1;

EXCEPT that portion of Lot 5 within Alvernon Way as shown in Book 1 of Road Maps at Page 100, records of Pima County, Arizona; and

EXCEPT the East 20 feet of the West 30 feet of Lot 5 as conveyed to the City of Tucson, a municipal corporation, by Deed recorded in Docket 1114 at Page 248, records of Pima County, Arizona; and

EXCEPT that portion of Lot 5 conveyed to the City of Tucson, a municipal corporation, by Deed recorded in Docket 4108 at Page 665, records of Pima County, Arizona, described as follows:

A three-sided parcel situate in Lot 5, said parcel being bounded on the:

North, by the North line of Lot 5;

West, by the East line of the West 30 feet of Lot 5; and

Southeast, by the arc of a circle with a radius of 25 feet, concave to the Southeast, and tangent to the North and West lines of said three-sided parcel;

EXCEPT a portion of that certain parcel described in Docket 11467 at Page 2633 in the records of the Pima County Recorder, Pima County, Arizona, beings portion of Lots 4 and 5, in Block 13, of COUNTRY CLUB HEIGHTS, a subdivision of Pima County Arizona, according to the map or plat thereof of record in the office of the County Recorder of Pima County, Arizona, in Book 4 of Maps and Plats at Page 27 and Book 5 of Maps and Plats at Page 1, and situate in the Southeast quarter of Section 11, Township 15 South, Range 14 East, Gila and Salt River Meridian, Pima County, Arizona, more particularly described as follows:

BEGINNING at the Southwest corner of that certain parcel described in said Docket 11467 at page 2633;

THENCE North 00° 19' 20" West along the East line of that certain parcel described in said Docket 11467 at Page 2633, 131.05 feet;

THENCE South 89° 24' 25" East, 82.28 feet to a point of curvature;

THENCE Southeasterly along a curve, concave to the Southwest and having a radius of 37.00 feet and a central angle of 43° 49' 23", an arc distance of 28.30 feet to a point of reverse curvature;

THENCE Southeasterly along a curve concave to the Northeast and having a radius of 90.52 feet and a central angle of 46" 20' 52", an arc distance of 73.22 feet to a point of non-tangency from which a radial line bears North 01° 55' 54" West;

THENCE South 00° 00' 43" West; 95.99 feet to the South line of that certain parcel described in said Docket 11467 at Page 2633;

THENCE North 89° 16' 58" West along said South line, 173.45 feet the POINT BEGINNING.

# EXHIBIT "2"

## OPERATING AGREEMENT
### OF
### 60 NORTH ALVERNON, L.L.C.

This Agreement is made and entered into as of the 1st day of October, 2009, by and between the following:

McMahon Properties, L.L.C., an Arizona limited liability company ("McMahon");

MHOPG, L.L.C., an Arizona limited liability company ("MHOPG");

who are the Members and Manager of 60 North Alvernon, L.L.C., an Arizona limited liability company.

### ARTICLE I
### FORMATION; NAME; PURPOSES; DEFINITIONS

**1.1 Formation.** Pursuant to the Arizona Limited Liability Company Act, the parties have formed an Arizona limited liability company effective upon the filing of the Articles of Organization thereof with the Arizona Corporation Commission. The parties shall immediately, and from time to time hereafter, as may be required by law or as requested by the Manager, execute all amendments of the Articles of Organization, and do all filing, recording, and other acts as may be appropriate to comply with the operation of the Company under the Act.

**1.2 Intent.** It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes. It also is the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the Federal Bankruptcy Code. No Member shall take any action inconsistent with the express intent of the parties hereto.

**1.3 Name.** The name of the Company shall be:

"60 North Alvernon, L.L.C."

**1.4 Place of Business.** The principal place of business of the Company shall be 4644 East Ft. Lowell Road, Tucson, Arizona 85711, or such other place as the Manager shall determine in his discretion.

**1.5 Purpose.** The purpose for which the Company is organized is to own, hold for investment, and lease the real property located at 60 North Alvernon Way, Tucson, Pima County, Arizona, as described on Exhibit A, attached hereto and made a part hereof (the "Alvernon Property"), and the transaction of any and all lawful business for which limited liability companies may be organized under the laws of the State of Arizona, as they may be amended from time to time.

**1.6 Term.** The Company shall commence upon the filing of its Articles of Organization and shall continue until such time as it shall be terminated under the provisions of Article IX hereof.

**1.7 Members and Manager.** The names and addresses of the initial Members of the Company are:

> McMahon Properties, L.L.C.
> 4644 East Ft. Lowell Road
> Tucson, Arizona 85712
>
> MHOPG, L.L.C.
> c/o Don Martin
> 3371 E. Hemisphere Loop
> Tucson, Arizona 85706

The name and address of the initial Manager of the Company is:

> McMahon Properties, L.L.C.
> 4644 East Ft. Lowell Road
> Tucson, Arizona 85712

**1.8 Agent for Service of Process.** The name and business address of the agent for service of process for the Company is Melissa Noshay Petro, Esq., Udall Law Firm, L.L.P., 4801 East Broadway Boulevard, Suite 400, Tucson, Arizona 85711, or such other person or entity as the Manager shall appoint from time to time.

**1.9 Definitions.** Whenever used in this Agreement, the following terms shall have the following meanings:

> (a) "Act" shall mean the Arizona Limited Liability Company Act.

> (b) "Additional Member" shall mean any person who is admitted to the Company as an Additional Member pursuant to Articles VII and VIII of this Agreement.

- 2 -

(c) "Agreement" shall mean this written Agreement as the same may be amended from time to time. No other document or oral agreement among the Members and Manager shall be treated as part of or superseding this Agreement unless it is reduced to writing and it has been signed by All of the Members and Manager.

(d) "All of the Members" shall mean a unanimous vote of the Members who are not in default under this Agreement.

(e) "Bankruptcy Code" shall mean the Bankruptcy Code of 1978, as amended from time to time.

(f) "Capital Account" shall mean the account established and maintained for each Member in accordance with this Agreement and applicable Treasury Regulations.

(g) "Capital Contribution" shall mean any contribution to the capital of the Company in cash, property, or services by a Member whenever made. "Initial Capital Contribution" shall mean the initial contributions to the capital of the Company made pursuant to Section 2.1 of this Agreement. "Additional Capital Contributions" shall mean the contributions made pursuant to Section 2.2 of this Agreement.

(h) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(i) "Company" shall refer to 60 North Alvernon, L.L.C.

(j) "Company Property" shall include all property, both real and personal, that is titled in the name of the Company or is titled in the name of one or more of the Members or Manager but is Company Property by agreement of the Members and Manager.

(k) "Events of Withdrawal" shall mean those occurrences listed in Act Section 29-733.

(l) "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

(m) "Gross Asset Value" shall mean with respect to any asset, other than money contributed by a Member to the Company's capital or distributed by the Company to any Member, the amount of the agreed fair market asset value of such asset less the amount of the debts secured thereby, or, if no fair

- 3 -

market value for such asset can be agreed upon, the appraised value thereof, based upon an appraisal procedure selected by the Manager.

(n) "Interest" shall mean a Member's various interests in the Company as designated in Article II of this Agreement including the economic rights of a Member and his permitted assignees and successors to share in distributions of cash and other property from the Company pursuant to the Act and this Agreement.

(o) "Majority-In-Interest" shall mean a vote of at least fifty-one percent (51%) in Voting Control Interests of the Members who are not in default under this Agreement.

(p) "Manager" or "Managers" shall mean that Person or those Persons designated as such pursuant to Section 3.1(a) of this Agreement.

(q) "Member" shall mean each of the parties who execute a counterpart of this Agreement as a Member and each of the parties who may hereafter become Additional or Successor Members.

(r) "Net Profits and Net Losses" shall mean, for each Fiscal Year, the combination of the income, gain, losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year under the accrual method of accounting, if permitted, and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes.

(s) "Organization Expenses" shall mean those expenses incurred in connection with the formation of the Company.

(t) "Person" shall mean any individual and any legal entity, and their respective heirs, executors, administrators, legal representatives, successors, and assigns.

(u) "Profit and Loss Percentage Interest" shall be the percentage interests in the profits and losses (economic matters) of the Company set forth in Article II hereof allocated to the Members based on the ratio of their initial Capital Contributions received by the Company.

(v) "Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during such period

- 4 -

to reserves which shall be maintained in amounts deemed
sufficient by the Manager for working capital and to pay taxes,
insurance, debt service or other costs or expenses incident to
the ownership or operation of the Company's business.

(w) "Successor Member" shall mean any person who is
admitted to the Company as a Successor Member pursuant to
Article VII hereof.

(x) "Treasury Regulations" shall mean the Regulations
issued by the Treasury under the Code.

## ARTICLE II
### CAPITALIZATION OF THE COMPANY; COMPANY BORROWING

2.1 **Initial Capital Contributions.**

(a) **Initial Contributions.** Each Member shall make the
following initial contributions of money, property, and contract
rights to the Company when requested by the Manager from time to
time:

| Member | Capital Contribution | Profit and Loss Percentage Interest | Voting Control Interest |
|---|---|---|---|
| McMahon | The conveyance to the Company of the Alvernon Property subject only to the matters of record approved by the Manager; and the assignment of all of its interests in any leases relating thereto. | 87.50% | 87.50% |
| MHOPG | The sum of $137,500 in the form of immediately available funds, or the contribution to the Company of promissory notes made by other Persons acceptable to the Manager in its sole discretion. | 12.50% | 12.50% |

- 5 -

(b) **Calculations**. All of the Members acknowledge and agree that the foregoing Interests for the initial Capital Contributions set forth above are fair and reasonable in light of the facts and circumstances leading up to this Agreement. The Members also acknowledge and agree that the Gross Asset Value of the Alvernon Property is $1,975,000.

The contribution and conveyance of the Alvernon Property to the Company shall be by special warranty deed, subject to the lien of that certain Deed of Trust and Assignments of Rents described in Exhibit B attached hereto and made a part hereof (the "Existing Lien"), which secures the obligations of McMahon under a certain promissory note, which shall not be assumed by the Company. However, the Company shall make all future payments of principal and interest thereunder; and take all actions necessary or required to prevent a default thereunder.

The Members shall take all actions necessary, required, or convenient to effectuate their initial Capital Contributions described above as and when required as provided herein. Any title insurance deemed necessary by the Manager shall be an operating expense of the Company. McMahon shall assign to the Company all of its right, title and interest in and to all permits, documents, contract rights, licenses, approvals, and leases pertaining to the Alvernon Property, including, without limitation, that certain Lease dated September 30, 2009, with Old Pueblo Grille, LLC, as tenant thereunder, a copy of which has been reviewed and approved by the Members and Manager ("OPG Lease") and is attached as Exhibit C. The Company shall assume and perform all obligations of the landlord/lessor under the OPG Lease. McMahon shall deliver to the Manager copies of any existing environmental reports, civil drawings, engineering reports, surveys, soil tests, permits, reports, copies of existing title policies pertaining to the Alvernon Property, and a copy of and such other documents as McMahon may have in its possession or control pertaining to the Alvernon Property.

**2.2 Additional Capital Contributions.**

(a) **Additional Capital Contributions as to All Members**. Notwithstanding any other provision contained herein, no additional Capital Contribution shall be required of any Member unless such Member expressly consents thereto. If All of the Members determine at any time that the Company requires additional cash contributions to capital in order to pay when due the obligations and expenses of the Company or otherwise to

- 6 -

accomplish the Company's purposes, the Managers shall give written notice to each Member of the amount(s) and date(s) on which such additional contributions are required. The Members' respective shares of each additional contribution required in such notice shall be in proportion to their relative Profit and Loss Percentage Interests. On or before each due date specified in such notice, each Member shall contribute to the capital of the Company his or her share of the total amount to be contributed on that date. The Members' obligation to make additional Capital Contributions shall be a personal obligation of each Member and shall be enforceable by the Company, the Managers and each of its Members, but shall not be enforceable by any third party creditor of the Company or any other Person, which shall not be deemed a third-party beneficiary hereof. The failure of a Member to make an additional Capital Contribution within thirty (30) days after the same shall become due shall constitute a material breach of this Agreement and the Member shall be considered in default of this Agreement. The amount of any delinquent additional contribution plus ten percent (10%) interest per annum may be offset by the Company from any amounts otherwise distributable or payable by the Company to the Member in default, and no further distribution of cash or other property shall be paid to a defaulting Member (or his or her assignee or other successor) while such delinquent contribution remains unpaid.

(b) **Right of a Non-Defaulting Member to Loan to a Defaulting Member**. In the event a Member fails to contribute said Member's pro rata share of an additional contribution within the time period set forth above, any non-defaulting Member shall have the right, but not the obligation, to pay the defaulting Member's pro rata share of such additional capital contribution. The amount so paid by the non-defaulting Member shall be deemed a personal loan from the non-defaulting Member to the defaulting Member, which shall be repaid solely from distributions hereunder, together with ten percent (10%) interest thereon (simple); and the defaulting Member hereby grants to the non-defaulting Member a security interest in and to all of the defaulting Member's Interests to secure the repayment of such loan and interest thereon. Notwithstanding any other terms or conditions hereof, all distributions which are to be made to a defaulting Member shall be paid to the lending non-defaulting Member until all of the defaulting Member's loans and interest thereon have been fully repaid.

**2.3 Capital Accounts.**

- 7 -

(a) **Debits and Credits**. A separate Capital Account shall be maintained for each Member in accordance with the applicable provisions of the Treasury Regulations:

(1) Each Member's Capital Account shall be credited with such Member's Capital Contributions, such Member's distributive share of Net Profits allocated to such Member in accordance with the provisions of this Agreement, any items in the nature of income or gain that are specially allocated pursuant to Sections 2.2 (a) and 6.4 hereof, and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company Property distributed to such Member.

(2) Each Member's Capital Account shall be debited by the amount of cash distributed to such Member in accordance with this Agreement, the Gross Asset Value of any other Company Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Net Losses allocated to such Member in accordance with this Agreement, any items in the nature of expenses or losses that are specially allocated pursuant to Section 6.4, and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

(3) In the event any Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(4) In the event the Gross Asset Values of the Company assets are adjusted pursuant to this Agreement, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the aggregate net adjustment, as if the Company had recognized gain or loss equal to the amount of such aggregate net adjustment and the resulting gain or loss had been allocated among the Members in accordance with this Agreement.

(b) **Interpretation and Changes**. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Code and applicable Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. If the Manager determines, after consultation with Company counsel, that it is prudent to modify the manner in which Capital Accounts, or any debits or credits thereto are allocated or computed, in order to comply with such applicable federal law, the Company shall make such modification without the consent of

- 8 -

any of the Member being required, provided, however, that such modification does not have a material adverse affect on the amount properly distributable to any Member upon the termination of the Company and that such modification will not increase the liability of any Member to third parties.

**2.4 Prior Loan.** The Company shall receive title to the Alvernon Property subject to the Existing Lien, but shall not assume the obligations secured thereby ("Prior Loan"), pursuant to the terms and conditions of any agreements requested by the lender thereunder ("Lender Agreement"). The Alvernon Property shall continue to serve as collateral and security for the repayment of the Prior Loan and all interest and other obligations relating thereto. The Manager, for and on behalf of the Company, shall have the exclusive authority to execute, acknowledge, and deliver to the lender any and all documents and instruments required thereby as a condition precedent to the conveyance of the Alvernon Property to the Company. All of the Members have reviewed all documents and instruments relating to the Prior Loan and approve the terms and conditions thereof.

**2.5. Member Loans to Meet Company Obligations.** If, at any time, any payment is necessary to avoid or cure a default on any obligation secured by lien on the Alvernon Property that is senior to the interest of Company in the Alvernon Property or to prevent a foreclosure, foreclosure or trustee's sale of such a lien, or to redeem the Alvernon Property following such a sale, any Member may, in the sole and absolute discretion of the Member, after giving five (5) days notice to the Manager and the other Members, make the payment, provided each Member shall have an equal opportunity to contribute a proportionate amount towards such payment. The cost incurred by such Member to make the payment, as reflected in the notice to the Manager and the other Members, shall be repaid by the Company, together with ten percent (10%) simple interest, to such Member before any distributions are made to any Member. The Member's right to be repaid by the Company shall be in addition to any right the Member may otherwise have to be repaid or reimbursed, but the Member shall have no right of contribution from other Members.

### ARTICLE III
### MANAGEMENT OF COMPANY

**3.1 Management.**

    **(a) Manager Managed.** The business and affairs of the Company shall be managed exclusively by the Manager in

- 9 -

accordance with the Act and the terms of this Agreement. The Manager of the Company may be appointed and removed from time to time only by a majority of the Members (not based on Interests) who are not then in default under this Agreement. The Members hereby designate and appoint only McMahon to act as the initial Manager of the Company. Each Manager shall devote such time and attention to the management and affairs of the Company as shall be reasonably appropriate for the efficient and timely conduct of its business, but no Manager shall be required to devote the full time services of any individual. Except as otherwise provided by law or this Agreement, all actions relating to the management and conduct of the business of the Company, and all acts of the Company hereunder, shall be taken upon the consent or approval of a majority of the Managers, if there is more than one.

(b) **Day to Day Handling of Affairs.** Subject to the provisions of Section 3.1(a) above and Sections 3.2 and 3.3 below, the Managers shall be responsible for and authorized to handle the day to day affairs of the Company. The day to day affairs of the Company shall include all actions necessary to achieve the purposes of the Company as provided above. Written records of all meetings and actions taken by the Managers shall be kept thereby. Subject to the other terms and conditions hereof, the Managers shall have full, exclusive and complete power to manage and control the day to day affairs of the Company, including, without limitation, pay the debts and obligations of the Company as they become due, the power to negotiate and execute contracts, leases, subleases, and other instruments and documents in the name of the Company and take any other actions on behalf of the Company as required hereunder or as approved by the Members or other Managers pursuant to the other terms and conditions hereof. The Managers shall also have the authority to carry out all of the Major Decisions and Member Decisions as defined below in accordance with the terms and conditions hereof. Furthermore, the Managers shall have the right to retain, employ, coordinate, and terminate the services of all employees, supervisors, accountants, attorneys, vendors, architects, engineers, contractors and subcontractors, and other persons necessary or appropriate to carry out the business of the Company.

3.2 **Major Decisions.** No act shall be taken or sum expended or obligation incurred by the Company or any Manager with respect to a matter within the scope of any of the major decisions affecting the Company as defined below ("Major Decisions"), unless such of the Major Decisions have been

- 10 -

approved in advance by a Majority-In-Interest of the Members or as otherwise provided or required herein. The "Major Decisions" shall be the following:

(a)  To select depreciation and accounting methods, make elections and make other decisions with respect to treatment of various transactions for federal and state income tax purposes, consistent with the other provisions of this Agreement;

(b)  To borrow money for the Company from banks, other lending institutions, the Members, or affiliates of the Members or refinance the Alvernon Property, so long as (i) the proceeds of such refinancing or borrowing are used to pay off the existing loan on the Alvernon Property and/or for the sole benefit of the Company, and (ii) the assets of the Company are not used to secure any obligation of any person or entity other than the Company;

(c)  To either sell or to dispose of all or substantially all of the assets of the Company, subject, however, to the Members' right of first refusal provided in subsection 7.9;

(d)  To assign, pledge, encumber, or otherwise create a security interest in the assets of the Company in connection with a loan pursuant to Subsection (b) above; or

(e)  To modify or amend the terms of the Prior Loan (so long as done only for the benefit of the Company) or the OPG Lease.

Notwithstanding the above, any decisions which require the approval of All of the Members under the terms of this Agreement or by law shall require such approval.

**3.3  Member Decisions.**  No act shall be taken or sum expended or obligation incurred by the Company or any Manager with respect to a matter within the scope of any of the Member decisions affecting the Company as defined below ("Member Decisions") unless the terms and conditions thereof have been approved in advance by All of the Members. The "Member Decisions" shall be the following:

(a)  Amending this Agreement;

(b)  Admitting a new Member;

- 11 -

(c) Acquiring any interest (whether leasehold or fee simple) in any additional real property;

(d) Making an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy, or appoint a receiver for the Company;

(e) Using the assets of the Company to secure the obligations of any Manager, Member or affiliate of a Manager or Member, or any other person or entity;

(f) Making any material change in the Company purpose;

(g) Making any other decision or take any other action which involves an amount in excess of $100,000.00;

(h) Causing the Company to guaranty, cosign, or otherwise become liable for the obligations of any Manager, Member, affiliate of a Manager or Member, or any other person or entity,

(i) Selling or leasing the Alvernon Property (except as expressly permitted by subsections 2.1 and 3.3), or

(j) Taking any other action which this Agreement specifically requires to be agreed upon by a unanimous vote of All of the Members.

**3.4 Reliance by Third Parties.** Any Person dealing with a Manager shall have the right to rely on a written certification by that Manager that any required approval of the Manager or the Members has been obtained, and upon execution of such certificate by a Manager no further evidence of such approval shall be required.

**3.5 Restrictions on Members.** Notwithstanding any other provision hereof, no single Member is authorized or empowered to execute, deliver, or perform any agreements, acts, transactions, or matters contemplated in this Agreement on behalf of the Company a gent for the Company, notwithstanding any applicable law, rule, or regulations to the contrary.

**3.6 Bank Accounts and Financial Reporting.** The Manager may from time to time open bank accounts in the name of the Company. The Manager shall provide reports to all of the Members of the material financial activities and condition of the

- 12 -

Company as requested from time to time, but not more often than quarterly.

**3.7 Indemnity of Each Manager.** The Company, its receiver or trustee shall, to the maximum extent permitted by applicable law, indemnify, defend, protect and hold harmless the Manager, to the extent of the Company's assets and insurance, for, from and against any liability, damage, cost, expense, loss, claim or judgment incurred by any Manager arising out of any claim based upon acts performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, attorneys' fees and costs incurred by the Manager in settlement or defense of such claims. Notwithstanding the foregoing, the Manager shall not be so indemnified, defended, protected, or held harmless for claims based upon acts or omissions in breach of this Agreement or which constitute fraud, gross negligence, willful misconduct, or breach of fiduciary or other duty to the Company or to the Members.

**3.8 Tax Matters Person.** McMahon shall be selected to act as "tax matters person" of the Company pursuant to Section 6231 of the Code. The "tax matters person" shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary or required in each jurisdiction in which the Company does business. Copies of all tax returns required to be filed by the Company, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

**3.9 Manager Reimbursements.** The Manager shall be entitled to a reimbursement of all reasonable costs and expenses which it incurs after the date first set forth above for work or services performed by it and its respective members, officers, directors, employees, and agents which are solely for Company purposes.

**3.10 No Management Fees.** McMahon is receiving its Interests in part because of its agreement to serve as the initial day to day Manager. Accordingly, the initial Manager shall not be entitled to any other compensation for acting as a Manager. The compensation for any successor day to day Manager shall be subject to the approval of a Majority-In-Interest of the Members.

**ARTICLE IV**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

- 13 -

**4.1 Limitation on Management.** The Members' rights to affect the business or affairs of the Company shall be limited to the terms and conditions hereof.

**4.2 Limitation of Liability.** Each Member's liability for the debts and obligations of the Company shall be limited as set forth in A.R.S. Section 29-651 and other applicable law.

**4.3 List of Members.** A list showing the names, last known addresses, and Interests of all Members in the Company shall be maintained at the registered office of the Company.

**4.4 Company Books.** During the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents, including, without limitation, a copy of the Articles of Organization initially filed with the Arizona Corporation Commission, copies of this Agreement, together with any supplements, modifications or amendments hereto, any prior operating agreements no longer in effect, written agreements by a Member to make a Capital Contribution to the Company, copies of the Company's federal, state and local income tax returns and reports and copies of all financial statements shall be maintained and preserved at the Company's registered office. Each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the Member's expense.

**4.5 No Priority on Return of Capital.** No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses, or distributions, provided that this section shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**ARTICLE V**
**MEETINGS OF MEMBERS**

**5.1 Annual Meeting.** An annual meeting of the Members shall be held on the second Tuesday in September or at such other time as shall be determined by the Manager, commencing with the year 2010 for the purpose of the transaction of such business as may come before the meeting.

**5.2 Special Meetings.** Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by a Majority-In-Interest of the Members at any time upon not less than ten (10) days prior written notice to all Members.

- 14 -

**5.3 Place of Meetings.** The Manager may designate any place, either within or outside the State of Arizona, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be held at the office of the Company. Meetings may take place by conference call, in which case the immediately preceding sentence shall not apply.

**5.4 Notice of Meetings.** Except as provided in Section 5.5, written notice stating the place, day, and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three (3) nor more than twenty (20) days before the date of the meeting, as set forth in Section 10.1 below, by or at the direction of the Manager, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at his or her address as it appears on the books of the Company, with postage thereon prepaid. If transmitted by way of facsimile, such notice shall be deemed to be delivered on the date of such facsimile transmission to the fax number, if any, for the respective Member which has been supplied by such Member and identified as such Member's facsimile number.

**5.5 Meeting of All Members.** If all of the Members shall meet at any time and place, either within or outside of the State of Arizona, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting all lawful action may be taken.

**5.6 Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any

- 15 -

meeting of Members has been made as provided in this section, such determination shall apply to any adjournment thereof.

**5.7 Quorum.** A Majority-In-Interest of the Members represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at a meeting.

**5.8 Manner of Acting.** If a quorum is present, the affirmative vote of a Majority-In-Interest of the Members shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Agreement.

**5.9 Proxies.** At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

**5.10 Action by Members Without a Meeting.** Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**5.11 Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**ARTICLE VI**
**NET CASH FLOW, DISTRIBUTIONS; NET PROFITS AND LOSSES**

- 16 -

**6.1 Net Cash Flow Distributions During the Operating Period.**

(a) **Definitions.** For purposes of this Section 6.1 the term "Net Cash Flow" is defined as the excess of "Company Cash Receipts During the Operating Period" over "Company Disbursements During the Operating Period." An "Operating Period" shall mean the period of time for, during or after which Net Cash Flow is being calculated.

(1) "Company Cash Receipts" shall mean, without limitation, all cash received by the Company from whatever source, including rents and license fees.

(2) "Company Disbursements During the Operating Period" shall mean:

(i) Payment of operating expenses of the Company and all other expenses related to the formation or operation of the Company or incurred with respect to the Company Property or purpose;

(ii) Payment for improvements made upon the Company Property and the purchase of capital assets;

(iii) The payment of amounts of principal and interest due on Company loans or loans secured by the Alvernon Property (including any Member loans and the Prior Loan and interest thereon); and

(iv) Such additional Reserves for future expenses as the Managers deem reasonably necessary.

(b) **Distributions During the Operating Period.** The Net Cash Flow, if any, for each Operating Period shall be distributed to the Members quarterly, subject to Section 6.4, in accordance with the Profit and Loss Percentage Interests under Section 2.1.

**6.2 Intentionally Deleted.**

**6.3 Allocation of Net Profits and Net Losses for Tax Purposes.** Net Profits shall be allocated to the Members in the same ratio as cash is distributed under the provisions of Section 6.1 above. Net Losses shall first offset prior income allocations and then be allocated to the Members in accordance with their Profit and Loss Percentage Interests. The foregoing allocations of Net Profits and Net Losses shall be subject to

- 17 -

any special allocations required under or referable from Section 6.4 below.

**6.4  Special Allocations.**

(a)  **Qualified Income Offset.** In the event any Member, in such capacity, unexpectedly receives any adjustments, allocations or distributions described in any Treasury Regulation Sections regarding depletion deductions, mandatory allocations under Treasury Regulations, family partnerships, the so-called varying interest rules, certain in-kind distributions, and distributions to the extent they exceed certain expected offsetting increases in a Member's Capital Account, items of Company income and gain shall be specially allocated to such Members in an amount and a manner sufficient to eliminate, as quickly as possible, the deficit balances in the Member's Capital Account created by such adjustments, allocations or distributions. Any special allocations of items of income or gain pursuant to this subsection (a) shall be taken into account in computing subsequent allocations of Net Profits pursuant to this Article VI, so that the net amount of any items so allocated and the Net Profits, Net Losses or other items allocated to each Member pursuant to this Article VI shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to this Article VI as if such unexpected adjustments, allocations, or distributions had not occurred.

(b)  **Section 704(c) Allocations.** In accordance with Section 704(c) of the Code and the applicable Treasury Regulations issued thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company, shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value. In the event the Gross Asset Value of any Company Property is adjusted pursuant to this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose of this Agreement. Allocations made pursuant to this subsection (b) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in

- 18 -

computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Agreement.

(c) **Other Allocations.** The Manager shall make such other special allocations as are required in order to comply with any mandatory provision of the applicable Treasury Regulations or to reflect a Member's economic interest in the Company determined with reference to such Member's right to receive distributions from the Company and such Member's obligation to pay its expenses and liabilities.

(d) **Acknowledgment.** The Members are aware of the income tax consequences of the allocations made by this Article VI and hereby agree to be bound by the provisions of this Article VI in reporting their share of Company income and loss for income tax purposes.

**6.5  Limitation Upon Distribution.** No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

**6.6  No Interest On or Return of Capital Contributions.** No Member shall be entitled to interest on the Member's Capital Contribution or to the return of the Member's Capital Contribution, except as otherwise specifically provided for herein.

**6.7  Loans to the Company.** Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company. Upon the affirmative vote of a Majority-In-Interest of the Members and Manager, the Company may from time to time borrow from one or more Members who agree to make a loan to the Company such sums as are needed to cover operational or other costs or expenses of the Company. Simple interest on such Member loans shall accrue at the rate determined by a Majority-In-Interest of the Members.

**6.8  Accounting Method.** The books and records of account of the Company shall be maintained in accordance with the accrual method of accounting, if permitted.

**6.9  Accounting Period.** The Company's accounting period shall be the calendar year.

**ARTICLE VII**

- 19 -

# PURCHASE AND SALE OF COMPANY INTERESTS; SPOUSAL MATTERS

## 7.1 Limitations on Transfer of Company Interest.

(a) No Member shall sell, make an assignment, including an assignment for the benefit of creditors or transfer to a trustee or receiver for the benefit of his creditors, give away, transfer, encumber, create a security interest in, or otherwise dispose of his Interest, or any part thereof, in the Company or, in the event the Member is a corporation or other form of entity, transfer the ownership or control thereof to any third party unless the Member shall have first obtained the written consent of all of the other Members; provided, however that any transfer, assignment or other disposition by a Member to another Member, to a trust, corporation, partnership or limited liability company which is more than fifty percent (50%) owned and controlled by that Member, or to a trust for the benefit of such Member's lineal descendants which is controlled by that Member, (in every case, the non-transferring Members shall be notified of such transfer) shall not be deemed to be a sale, gift, transfer or other disposition of a Member's Interest in the Company which requires prior written consent or gives rise to the right of first refusal or other rights hereinafter set forth.

(b) None of the Members shall have the right to sell, assign, transfer or convey any interest in the Company, except in strict accordance with the provisions hereinabove or hereinafter set forth in accordance within this Article VII.

## 7.2 Right of First Refusal.
Subject to Section 7.1, in the event that any Member (hereinafter referred to as the "Selling Member") shall desire to sell all or part of his Interest in the Company to any third party and he or she shall have received a bona fide written offer therefor which is acceptable to him, he or she shall, not less than thirty (30) days prior to the date of the proposed sale, give notice (the "Notice of Sale") to the other Members (the "Optionee(s)") subject to the following terms and conditions:

(a) The Notice of Sale shall state that a bona fide offer has been received by the Selling Member from such third party and shall contain the following information:

(1) the fact that the Selling Member's Interest in the Company is offered for sale;

(2) the price, terms, and conditions of sale;

- 20 -

(3) the name and address of the third party to whom such Interest is proposed to be sold; and

(4) an affirmative offer by the Selling Member to sell his Interest in the Company to the Optionee for the same consideration and upon the same terms and conditions set forth in the Notice for Sale or its cash equivalent.

(b) The Optionee(s) shall have the option, for a period of thirty (30) days from the date of such Notice of Sale, within which to exercise his option to purchase all, or a proportionate share if more than one Optionee elects to exercise its option, of the Selling Member's Interest. Any Optionee electing to acquire all or the proportionate share of the Selling Member's Interest shall notify such Selling Member of such election in writing prior to the expiration of the thirty (30) day period.

(c) The Optionee(s) shall return a completed Exercise of Option notice to the Selling Member within the option period or they shall be deemed conclusively to have elected not to exercise their option conferred herein, and the Selling Member shall thereafter be free to sell, but only in strict accordance with the Notice of Sale and the other terms and conditions hereof.

(d) The closing of the purchase of the Company Interest being offered for sale, or the portion thereof being purchased, shall take place on the ninetieth (90th) day after the expiration of the option (provided, however, that if such ninetieth (90th) day shall be a Saturday, Sunday or other business holiday in Tucson, Arizona, then such closing shall take place on the next succeeding regular business day) in the offices of the Company, or at such other time or place as may be mutually agreed upon in writing by the parties to the transaction to be closed.

**7.3 Natural Person Members Matters; Purchase of Deceased or Incompetent Member's Interest.** Subject to Section 7.1 above, upon the death or incompetency of a natural person Member, unless the deceased or incompetent Member's Interest is offered for sale pursuant to Section 7.2, for a period of ninety (90) days following his or her death or incompetency, as determined by the Member's physician, the other Members, in proportion to their Profit and Loss Percentage Interests, shall have the option to purchase the entire Interest from such Member or such Member's estate for the fair market value thereof. For purposes of this Section 7.3 and any other provisions referring to this

- 21 -

Section, the determination of fair market value shall be made as follows: the applicable personal representative, power of attorney, or guardian or other third party holder of the Interest shall meet with the remaining Members to attempt to agree upon a fair market value for the Interest; if the parties cannot agree upon a fair market value for the Interest, then the matter shall be submitted to binding arbitration pursuant to Section 10.9 of this Agreement.

**7.4  Third Party to Purchase the Company Property.**

(a)  If the Company receives a bona fide offer from a third party to purchase the entire Company Property, and the Company chooses not to sell the Company Property for any reason, then a Member may put his Interest in the Company to the Company, or the other Members based on a pro rata basis, and the Company, or the Members, shall be obligated to purchase that Member's Interest.

(b)  The purchase price for such Interest shall be the bona fide offer price allocable thereto. Such purchase price shall be paid in accordance with the terms set forth in the bona fide offer.

**7.5  Effect of Assignment of Member's Interest.** A Member's assignment of all or a portion of his Interest in the Company (the "Assignor Member") shall not dissolve the Company, release the Assignor Member from liability to the Company under the Articles of Organization, this Agreement or the Act, or entitle the assignee to participate in the business and affairs of the Company or to become or to exercise the rights of a Member unless the assignee is admitted as a Member as provided in Section 7.6 below. An assignee that has not become a Member is only entitled to receive, to the extent assigned, the share of distributions representing the return of contributions, and the allocations of Net Profits and Net Losses to which the Assignor Member would otherwise be entitled with respect to the assigned Interest.

**7.6  Admission of Assignee as Successor Member.** Upon the express written consent of All of the Members and the Managers, an assignee of a Member's Interest shall become a Member with the rights and powers of a Member to the extent of the Interest assigned, and shall be subject to the restrictions and liabilities of a Member under the Articles of Organization, this Agreement, and the Act. An assignee who becomes a Member shall also be liable for any obligations of his assignor to make Capital Contributions and Additional Capital Contributions. An

- 22 -

Assignor Member shall not be released from liability to the Company under the Articles of Organization, this Agreement, or the Act without the express written consent of All of the Members and the Managers, whether or not the assignee becomes a Successor Member. An Assignor Member shall remain a Member until the admission of the assignee as a Successor Member. In the event an assignee is admitted as a Successor Member, the effective date of his membership in the Company shall be the date of the Assignment unless otherwise provided in the written consent of the Managers.

   7.7  **Buy/Sell Obligation.**  Notwithstanding any other provision herein to the contrary, after the third (3rd) anniversary of the date first set forth above, the Members may transfer all, but not less than all, of their Interests to each other. Upon a Member desiring to transfer all of his or her Interests to another, or acquire all of the Interests of the other Members, he or she shall give written notice ("Transfer Notice") of his or her intent to do so to the other Member or Members (individually and together, the "Receiving Member"). The Transfer Notice shall indicate a dollar price for the Interests (per each 1%) and consideration therefor may only be cash or immediately available funds. The Receiving Member shall, within thirty (30) days after receipt of the Transfer Notice ("Election Period"), elect to either (a) acquire all, and not less than all, of such Interests from the other Member on the terms and conditions set forth in the Transfer Notice, or (b) require the Member delivering the Transfer Notice to purchase from the Receiving Member all, and not less than all, of the Receiving Member's Interest on the same terms and conditions as set forth in the Transfer Notice. In the event the Receiving Member does not make his (or their) election within the Election Period, or if more than one Receiving Member cannot agree as to how to respond, the Receiving Member shall be deemed to have elected to sell all, and not less than all, of his or her Interests to the other Member on the terms and conditions set forth in the Transfer Notice, unless one (1) Receiving Member elects within the Election Period to acquire all Interests held by the other Members, in which event he or she shall do so on the terms and conditions set forth in the Transfer Notice. Once delivered, the Transfer Notice may not be revoked or withdrawn and shall constitute a binding obligation of the Members to sell and purchase as provided above, the consummation of which shall occur on a date no later than ninety (90) days after receipt of the Transfer Notice. Once a Transfer Notice is given, no other Transfer Notice may be given until the closing date of the transaction relating thereto as provided herein.

- 23 -

**7.8  Obligatory Sale of Alvernon Property.** After expiration of the balance of the initial term of the OPG Lease, the Company shall sell the Alvernon Property in the event a majority of the Members (not based on Interests) within six (6) months thereafter so elect by retaining a commercial real estate agent approved by the Manager. In the event a majority of the Members do not elect to sell the Alvernon Property within such time period, the right of such Members to cause the sale of the Alvernon Property may be exercised thereby every five (5) years after the expiration of the initial term of the OPG Lease, provided the Members exercise such right within three (3) months after each such five (5) year period. The terms and conditions of the listing agreement and any purchase and sale agreement must be approved by a Majority-In-Interest vote of the Members.

**7.9  Sale of Alvernon Property - Right of First Refusal.** In the event that any Manager, on behalf of the Company, shall desire to sell the Alvernon Property to any third party (including the Manager or any affiliate) and he shall have received a bona fide written offer therefor which is acceptable to him, he shall, not less than thirty (30) days prior to the date of the proposed sale, give notice (the "Notice of Sale") to MHOPG subject to the following terms and conditions:

(a)  The Notice of Sale shall state that a bona fide offer has been received by the Manager from such third party and shall contain the following information:

(1)  the fact that the Alvernon Property is offered for sale;

(2)  the price, terms, and conditions of sale;

(3)  the name and address of the third party to whom the Alvernon Property is proposed to be sold; and

(4)  an affirmative offer by Manager, on behalf of the Company, to sell the Alvernon Property to MHOPG for the same consideration and upon the same terms and conditions set forth in the Notice for Sale or its cash equivalent.

(b)  MHOPG shall have the option, for a period of thirty (30) days from the date of such Notice of Sale, within which to exercise his option to purchase the Alvernon Property. MHOPG shall notify the Manager of such election in writing prior to the expiration of the thirty (30) day period.

- 24 -

(c) MHOPG shall return a completed Exercise of Option notice to the Manager within the option period or shall be deemed conclusively to have elected not to exercise its option conferred herein, and the Company shall thereafter be free to sell, but only in strict accordance with the Notice of Sale and the other terms and conditions hereof.

(d) The closing of the purchase of the Alvernon Property being offered for sale shall take place on the sixtieth (60th) day after the expiration of the option (provided, however, that if such sixtieth (60th) day shall be a Saturday, Sunday or other business holiday in Tucson, Arizona, then such closing shall take place on the next succeeding regular business day) in the offices of the Company, or at such other time or place as may be mutually agreed upon in writing by the parties to the transaction to be closed.

(e) If MHOPG fails to close, the Company, as its only remedy, shall thereafter be free to sell, but only in strict accordance with the Notice of Sale and the other terms and conditions hereof.

## ARTICLE VIII
## ADDITIONAL MEMBERS

8.1 **Additional Members.** After the formation of the Company, any Person acceptable to All of the Members and the Managers may become a Member of the Company for such consideration as All of the Members and the Managers shall determine, and upon such event all of the Profit and Loss Percentage Interests and Voting Control Interests shall be equitably reallocated by the Managers. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Managers may, at the time an additional Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to an additional Member for that portion of the Company's tax year in which an additional Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated thereunder.

## ARTICLE IX
## DISSOLUTION AND TERMINATION

9.1 **Dissolution.**

- 25 -

(a) The Company shall be dissolved upon the occurrence of any of the following events:

(1) by the written agreement by All the Members;

(2) upon the entry of a decree of dissolution under A.R.S. Section 29-785; or

(3) upon any other Event of Withdrawal, unless the business of the Company is continued by the specific consent of at least one Member given within ninety (90) days after such event and there is at least one (1) remaining Member. Each of the Members hereby agrees that within the sixty (60) days after the occurrence of an Event of Withdrawal (and provided that there is at least one (1) remaining Member of the Company), that they will consent, in writing, to continue the business of the Company.

(b) As soon as possible following the occurrence of any dissolution occurrence, if the Company is not continued, a representative of the Company shall execute and file a Notice of Winding Up with the Arizona Corporation Commission, if required under Arizona law.

**9.2 Effect of Filing of Dissolving Statement.** Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until Articles of Termination have been filed with the Arizona Corporation Commission or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

**9.3 Winding Up, Liquidation and Distribution of Assets.**

(a) Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities, and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Manager shall proceed to liquidate the Company Property, discharge the Company's obligations, and wind up the Company's business and affairs as promptly as is consistent with obtaining the fair value thereof. The proceeds of liquidation of the Company Property, to the extent sufficient therefor, shall be applied and distributed as follows:

- 26 -

(1) payment and discharge of all of the Company's debts and liabilities, including all costs relating to the dissolution, winding up, and liquidation and distribution of assets;

(2) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amount of such reserves shall be deemed to be an expense of the Company);

(3) repayment of all Member or Manager loans and interest thereon;

(4) distribute the remaining assets to the Members, either in cash or in kind, as determined by the Manager, in accordance with the positive balance of each Member's Capital Account as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth under any applicable Treasury Regulations; and

(5) any balance shall be distributed among the Members in accordance with the Profit and Loss Percentage Interests.

(c) Notwithstanding anything to the contrary in this Agreement, upon a liquidation under any applicable Treasury Regulations, if any Member has a negative deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

(d) Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e) The Members and the Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

- 27 -

9.4 **Articles of Termination.** When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, Articles of Termination shall be executed and filed with the Arizona Corporation Commission.

9.5 **Return of Contributions Non-Recourse to Other Members.** Except as provided by law, upon dissolution each Member shall look solely to the assets of the Company for the return of the Member's Capital Contribution. If the Company Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash or other property contribution of one or more Members, such Member or Members shall have no recourse against any other Member or the Company.

**ARTICLE X**
**MISCELLANEOUS PROVISIONS**

10.1 **Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an officer or member of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's or the Managers' addresses, as appropriate, which is set forth in this Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given three (3) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

10.2 **Application of Arizona Law; Entire Agreement.** This Agreement and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of Arizona. This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof. Any prior or contemporaneous agreements between all or any of the Members relating to the subject matter hereof are hereby terminated and are no longer of any force or effect.

10.3 **Waiver of Action for Partition.** Each Member irrevocably waives during the term of the Company any right that he or she may have to maintain any action for partition with respect to any Company Property.

10.4 **Amendments.** This Agreement may not be amended except by the unanimous written agreement of All of the Members.

- 28 -

**10.5 Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules, or regulations applicable hereto.

**10.6 Construction.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders and vice versa.

**10.7 Headings.** The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**10.8 Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**10.9 Rights and Remedies Cumulative; Arbitration.** The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. The rights and remedies are given in addition to any other rights and remedies the parties may have by law, in equity, statute, ordinance or otherwise. However, in the event any dispute or controversy arising out of this Agreement cannot be settled by the parties, such controversy or dispute shall be submitted to binding non-appealable arbitration with the Michelle Largan Mediation Law Firm, L.L.C. in Tucson, Arizona, the arbitrator to be selected by the firm. In the event the firm is not then in existence, the presiding judge of the Superior Court of Pima County, Arizona shall decide who the arbitrator shall be. Nothing contained herein is intended to prevent a Member from filing for dissolution with a court of competent jurisdiction pursuant A.R.S. Section 29-785 as amended or renumbered from time to time.

**10.10 Severability.** If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

- 29 -

**10.11 Heirs, Successors, and Assigns.** Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors, and assigns.

**10.12 Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any other Person not a party hereto.

**10.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**10.14 Attorneys' Fees.** Should any litigation or other legal proceeding concerning any provision of this Agreement or the rights and duties of any person or entity in relation hereto be commenced among the parties, or should any party institute any proceeding in a bankruptcy or similar court which has jurisdiction over any party or any or all of such other party's property, the party or parties prevailing in such litigation or proceeding shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for their attorneys' fees and court costs in such litigation or proceeding which fees and costs shall be determined by the court in such litigation or arbitrator in such proceeding or in a separate action brought for that purpose.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the day and year first above written. Each Member represents and warrants that his or her Interest has been acquired under this Agreement for his or her own account, for investment, and not with a view to, or for sale in connection with, any distribution thereof, nor with any intention of distributing or selling such Interest, and that the Member will not transfer, or attempt to transfer, his or her Interest in violation of the Securities Act of 1933 or any other applicable federal or state law. Each Member, by executing and delivering this Agreement, hereby represents and warrants to the Company, the other Members, the Manager, and the third parties described or referred to herein that the: (a) Member understands that this Agreement provides severe restrictions on the ability to dispose of or encumber an Interest in the Company indefinitely and he or she may be unable to liquidate it in case of emergency; (b) Member has read and understands the provisions of this Agreement and the authority and control of the Manager; (c) Member is experienced in business and understands the risks

- 30 -

inherent in business; (d) Member is able to financially comply with his or her obligations hereunder and is capable of suffering a total loss of his or her Capital Contributions hereunder; (e) Member understands that the Internal Revenue Service may disallow some or all of the deductions to be claimed by the Company, that the Company has no financial or operating history, that the Company involves a high degree of risk of loss, and that no governmental agency has made any finding or determination as to the fairness of the attributes of the Company or this Agreement; (f) Member is aware that the Manager, other Members, and affiliated Persons or organizations are presently, and may in the future be, engaged in businesses or ventures which are competitive with that of the Company, and the Member agrees and consents to such activities, even though there are conflicts of interest inherent therein and he or she may not be invited to participate in such other businesses or ventures; (g) Member understands that the Member is purchasing an Interest in the Company without having been furnished any offering literature or prospectus; (h) Member understands that all documents, records and books pertaining to the Company and the matters presented herein have been made available to Member and his or her advisors; and (i) Member understands, acknowledges and agrees that due to State Bar of Arizona ethical rules, it has been disclosed that the law firm of Udall Law Firm, L.L.P. is representing only McMahon in connection with this Agreement and all matters relating hereto, and that all other Members have had the opportunity to engage separate legal counsel and hereby waive any conflict which may otherwise exist.

McMahon Properties, L.L.C.,
an Arizona limited liability
company

By: Robert B. McMahon
Its: Manager

MCPG, L.L.C.,
an Arizona limited liability
company

By: Donald J. Martin
Its: Manager

- 31 -