McEvoy Daniels & Darcy,
4560 East Camp Lowell Drive
Tucson, Arizona 85712
Telephone: (520) 326-0133
Fax: (520) 326-5938

Sally M. Darcy
darcysm@aol.com
Attorney for Trustee

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| MCMAHON PROPERTIES, LLC, | Case No. 4-14-bk-00092-BMW |
| Debtor. | **TRUSTEE'S MOTION TO SELL PROPERTY OF THE ESTATE FREE AND CLEAR OF ALL LIENS AND CLAIMS PURSUANT TO 11 U.S.C. 363, LIENS TO ATTACH TO PROCEEDS** |

Christopher Linscott, duly appointed Chapter 11 Trustee ("Trustee") in the above captioned case, moves this Court for an Order authorizing him to sell assets of Debtor McMahon Properties, LLC ("Debtor"), free and clear of liens and claims, liens to attach to the proceeds, as more fully set forth below.

Debtor is an Arizona limited liability company. Its members are identified as Robert McMahon ("McMahon") and his wife, Danita McMahon. According to McMahon, the Debtor was formed as a limited liability company in 1997.

On January 3, 2014, the Debtor filed its petition under Chapter 11 of the Bankruptcy Code. On April 30, 2014, the Order appointing Christopher Linscott as the Trustee for the Debtor's Estate was entered.

McMahon initiated several other Chapter 11 bankruptcies for related entities:

| **Entity** | **Date Filed** | **Status** |
|---|---|---|
| McMahon's Steakhouse, LLC | January 31, 2014 | Chapter 11 |
| Old Pueblo Grill, LLC | January 31, 2014 | Chapter 11 |

| | | |
|---|---|---|
| Metro Restaurants, Inc. | January 31, 2014 | Converted |
| Metropolitan Grill, LLC | January 31, 2014 | Converted |
| Robert and Danita McMahon | January 22, 2015 | Chapter 11 |

The Debtor owns an unoccupied restaurant property at 6464 E. Tanque Verde Road in Tucson ("Tanque Verde Property"). The Tanque Verde Property was previously occupied by a single tenant operating a restaurant known as the "Nimbus Brewery." The Tanque Verde Property is subject to a lien in favor of National Bank of Arizona ("National Bank") in the approximate sum of $1,500,000.00.

The Tanque Verde Property was listed with CBRE. A cash offer was received in the amount of $1,500,000.00 subject to the terms and conditions of the Purchase Contract attached hereto as Exhibit "1." The Trustee, subject to Court approval, has accepted the offer.

Pursuant to the Purchase Contract, the Purchasers have a period of time to complete their due diligence. They are currently in the due diligence period.

A summary of the terms of the Purchase Contract are as follows:

1. The purchase price will be paid in full at closing;
2. The lien of National Bank will attach to the proceeds, and subject to the matters set forth below, will be paid at closing;
3. Commissions and customary closing costs will be paid from the sale proceeds at closing;
4. The sum of $50,000.00 will be paid to the Trustee at closing.
5. The Tanque Verde Property is being sold "AS IS";
6. The sale is subject to Court approval and higher bids.

. Pursuant to Section 363 of the Bankruptcy Code, the Trustee, exercising his business judgment, may sell assets of the Estate, subject to Court approval.

The Trustee seeks to sell the Tanque Verde Property pursuant to Section 363 of the Bankruptcy Code. The Trustee is aware that the brokers and agents of CBRE have shown the Tanque Verde Property to other potential buyers. The Trustee believes the sales and marketing process that has and continues to be undertaken by CBRE is thorough and adequate to obtain the

highest and best price for the Tanque Verde Property. Based on his business judgment, the Trustee believes the sale is in the best interest of the Estate.

The Trustee believes the sale is in the best interest of the Estate and requests that the Court approve the sale

RESPECTFULLY SUBMITTED this 22nd day of April, 2015.

McEVOY, DANIELS & DARCY, P.C.

By: /s/Sally M. Darcy
Sally M. Darcy
Attorney for Trustee

**ACCEPTED AND APPROVED:**

__/s/Matthew H. Sloan__
Matthew H. Sloan
Attorney for National Bank

Copy of the foregoing emailed/mailed this 22nd day of April, 2015, to:

Matthew H. Sloan    mhs@jhc-law.com
Jennings, Haug & Cunningham, LLP
2800 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-1049
Attorney for National Bank of Arizona

Scott D. Gibson    ecf@sdglaw.net
Law Office of Scott D. Gibson, PLLC
2329 N. Tucson Blvd.
Tucson, Arizona 85716
Attorney for Debtor

Renee Sandler Shamblin    renee.s.shamblin@usdoj.gov
Office of the U.S. Trustee
230 N. North First Avenue, Suite 204
Phoenix, Arizona 85003-1706

Steven D. Jerome    sjerome@swlaw.com
Jonathan M. Saffer    jmsaffer@swlaw.com
Jill H. Perrella    jperrella@swlaw.com
Snell & Wilmer, LLP
One South Church Avenue, Suite 1500
Tucson, Arizona 85701-1630
Attorney for Alliance Bank

McMahon Properties
4644 East Fort Lowell Road
Tucson, Arizona 85712-1111
Debtor

- 3 -

# EXHIBIT "1"

## COMMERCIAL / INVESTMENT

## CONTRACT OF SALE

**THIS CONTRACT OF SALE** (this "**Contract**") is made by and between Mc Mahon Properties, LLC ("**Seller**"), and **HEIGHTS PROPERTIES, LLP,** an Arizona limited liability partnership ("**Buyer**").

## RECITALS:

A.  6464 E. Tanque Verde, Tucson, AZ having Pima County Tax Parcel #133-16-033F with the legal description PTN SW4 NW4LYG SELY Tanque Verde Road 2.19 Acres SEC 6-14-15, Pima County Arizona, together with all easements and rights of way appurtenant thereto (the "**Property**").

B.  Seller desires to sell and convey and Buyer desires to purchase the Property upon the terms and conditions hereinafter set forth.

C.  Seller is represented by CBRE, and Buyer has retained the services of Prime Commercial Real Estate, LLC as Broker (hereinafter collectively referred to as the "**Broker**").

**NOW, THEREFORE,** in consideration of the promises and mutual covenants set forth herein, the parties hereto agree as follows:

## AGREEMENTS:

1.  **Sale.** Seller hereby agrees to sell the Property to Buyer and Buyer agrees to purchase the Property from Seller at the price and upon and in accordance with the following terms, conditions and other stipulations.

2.  **Purchase Price.** The purchase price shall be One Million Five Hundred Thousand Dollars ($1,500,000) (the "**Purchase Price**") payable as follows:

    A.  Fifty Thousand Dollars ($50,000) in cash as earnest money deposit and partial payment of the Purchase Price (the "**Earnest Deposit**"), which sum shall be deposited within one business day following the effective date of this Contract with a duly licensed escrow agent, Landmark Title Assurance Agency, Attn: Pam Tighe, One South Church Ave, Suite 2040, Tucson, Arizona, 85701, telephone: (520) 740-0424, fax: (520) 202-6318 (the "**Title Company**" or "**Escrow Agent**"), for placement in an interest-bearing account for the benefit of Buyer.

    B.  The balance in cash by wired funds at Closing (Cash at Closing to be adjusted to reflect the actual principal balance of the existing financing

1



On the completion of the Inspection Period the entire Earnest Deposit shall be non-refundable to Buyer under all circumstances except for the following: an uncured Seller default hereunder or the failure of Buyer to obtain approval of existing Financing, notwithstanding the Buyer's good faith effort to obtain the same.

The parties agree that the Earnest Deposit shall be deposited by Escrow Agent, as defined above, in an account with a federally insured financial institution bearing interest at the highest attainable rate, which interest shall be credited to Buyer at Closing.

3. **Closing Date**. Seller and Buyer agree that they will comply with all the terms and conditions of this Contract and close escrow on the 30th day following the satisfaction or waiver by Buyer of (a) the contingencies set forth in Section 7 and Section 9, and (b) any objections to the reports or survey described in Section 7, but not earlier than _____, 2015 or later than _____, 2015[1] (the "**Closing Date**" or "**Closing**"). If the transaction contemplated hereby fails to close by such date, this Contract is subject to cancellation as provided herein.

4. **Time of Acceptance**. This offer must be accepted by Seller on or before March 15, 2015.

5. **Prorations and Costs**. Real property taxes, including any communities facilities district special assessments, shall be prorated as of Closing. Seller and Buyer shall each pay one-half of the escrow fees. Seller shall be responsible for all state or local transfer taxes, if any and all lender assumption costs and fees. All other closing costs shall be paid by Seller or Buyer in accordance with local custom of the county wherein the Property is located. In the event taxes are prorated based upon estimates, then Buyer and Seller shall enter into a tax agreement prior to Closing which shall provide for a post-closing adjustment on taxes which are subject to the proration, based upon actual tax bills.

6. **Assessments**. The existing assessment if any shall be prorated as of the Closing Date. Seller shall be responsible for any other special assessment which may be a lien on Title of which the Property is a part which are a lien or encumbrance on the Property, including but not limited to installments which may become due subsequent to the Closing Date, shall be paid in full by Seller on or before the Closing Date.

7. **Preliminary Title Report; Survey; Reports; Approval Period; Information**.

A. Preliminary Title Report. Seller shall cause Title Company, within ten (10) calendar days after the effective date of this Contract, to provide Buyer with a preliminary report of the title (the "**Title Report**") to the Property (together with true, correct and legible copies of any and all instruments referred to in the Title Report as constituting exceptions or restrictions upon the title of Seller), disclosing all matters of record and other matters of which Title Company has knowledge which relate to the title

2

of the Property, and further, to provide Buyer with Title Company's requirements for the Closing, as well as Title Company's irrevocable issuance of an extended coverage owner's policy of title insurance (where available), which shall be at Seller's expense. Seller will cause Title Company to commit to issue at the close of this transaction, to and in favor of Buyer such policy of title insurance (the "**Policy**") in the amount of the Purchase Price insuring Buyer's title to the Property, subject only to those matters which appear on the Title Report and which have been deemed "**Permitted Exceptions**" as hereinafter set forth.

    B.  Survey. Buyer, at its option, may obtain a survey or survey update of the Property but Buyer's Approval Period shall not be extended beyond the Approval Period set forth below. Seller will provide to Buyer on the execution of this Agreement any survey in Seller's possession, AS-IS, without an obligation to update said survey.

    C.  Soils Report. Buyer, at its option, may obtain a soils report for the Property. Seller will provide to Buyer on the execution of this Agreement any soils report in Seller's possession, AS-IS, without obligation to update said soils report.

    D.  Approval Period. Buyer shall have an approval period of sixty days (60) days after Mutual Execution (the "**Approval Period**"), to review the Title Report, any Proforma Policy, any survey and any soils report, and to deliver in writing to Seller such objections as Buyer may have to anything contained therein. Any such item to which Buyer shall not object shall be deemed to be accepted by Buyer. If there are objections by Buyer, Seller shall in good faith attempt to satisfy the same prior to the lapse of the Inspection Period (defined below), but Seller shall not be required to incur any cost to do so. If Seller delivers written notice to Buyer on or before the lapse of the Approval Period that Seller is unable to satisfy such objections or Seller fails to deliver a notice, or if, for any reason, Seller is unable to convey title as set forth herein, Buyer may waive such objections and accept such title as Seller is able to convey by providing Seller and Escrow Agent written notice prior of the lapse of the Feasibility Period of Buyer's waiver of such objections. In the event Buyer elects, at its sole option, not to waive such objections, this Contract shall terminate at the end of the Inspection Period and the Earnest Deposit plus all interest accrued thereon shall be refunded to Buyer. Upon such occurrence, this Contract shall be null and void and the parties shall be relieved of all further liability hereunder.

    E.  Information. Unless required to be delivered earlier as provided above, Seller shall, within five (5) calendar days following the effective date of this Contract, provide Buyer with copies of any information in the possession or control of Seller regarding the Property which Seller deems relevant, including, but not limited to, any specifications for on-site or off-site improvements, reports on water and utility availability and quality, and environmental studies. All matters and reports are provided "AS-IS."

8.  **Documents and Escrow.**

3

A.  The Property, including any and all improvements thereon and rights and privileges appurtenant thereto, shall be conveyed to Buyer upon Closing by Special Warranty Deed subject to: (i) such matters as appearing on the Title Report, which are not objected to by Buyer (the "**Permitted Exceptions**"), and (ii) the Seller's Protections (as hereinafter defined below). Said deed, duly executed by Seller and appropriately acknowledged, shall be delivered to Escrow Agent, together with any other documents required herein to be recorded as required upon the fulfillment of Buyer's obligations under this Contract.

B.  Seller and Buyer direct Escrow Agent to attach its standard form escrow instructions to this Contract, which will constitute the entire escrow instructions to Escrow Agent. All documents necessary to close escrow shall be deposited with Escrow Agent. Seller and Buyer further agree to execute all documents necessary to close this transaction, in the standard forms used by Escrow Agent.

C.  If there is a conflict between the provisions of this Contract and any escrow instructions and attachments executed pursuant hereto, the provisions of this Contract shall be controlling.

9.  **Investigation/Feasibility Study.** For a period of Sixty (60) business days after the effective date of this Contract (the "**Investigation Period**"), Buyer, its agents, contractors and engineers, shall have the right to examine the Property, including, but not limited to environmental studies and soil analysis, the preparation of market or economic feasibility and development studies of the Property, the availability of water, sewer, gas, electricity, waste water treatment and other utilities and services to the Property and the costs of securing same, and the zoning pertaining to the Property, at any time after the effective date of this Contract with any persons whom it shall designate, including, without limitation of the foregoing contractors, engineers and soil testing personnel. Seller shall permit access to the Property to Buyer and any persons designated by Buyer, and Seller shall permit inspection and performance of any engineering tests to determine whether the Property is appropriate for the development contemplated by Buyer. To the extent that Buyer disturbs the Property, Buyer shall return the Property to the same condition as it was prior to the time of such entry. If Buyer determines during the Investigation Period, in Buyer's sole judgment and discretion, that the Property is not suitable for Buyer's intended use, Buyer shall give Seller and Escrow Agent written notice prior to the expiration of the Investigation Period of such fact. Upon receipt of such written notice, Escrow Agent shall refund the Earnest Deposit and accrued interest thereon to Buyer and both parties shall be released from all further obligations under this Contract. If Buyer provides such written notice to Seller and Escrow, then it shall be presumed that the Property is suitable for Buyer's intended use, and the Contract may not be terminated by Buyer for the reasons set forth in this Section. Buyer shall indemnify and hold Seller harmless from any damage or injury resulting to Seller or Seller's agents resulting from such investigation or study.

10.  **Default and Remedies.** If Buyer or Seller fail to perform any of the obligations due to be performed by the dates provided herein, the other party may send written notice to the defaulting party noticing them of their default. After three (3) days written notice, if either party

4

remains in the default, the non-defaulting party may terminate the contract and escrow agent is authorized to release any earnest money to the non-defaulting party. If Buyer fails to pay the balance of the Purchase Price when due, or otherwise defaults in any respect on any material obligation under this Contract, upon expiration of the notice period, Seller may elect to be released from the obligation to sell the Property to Buyer. Seller's sole remedy, in the event of such default, shall be to recover, as specified herein, the Earnest Deposit as liquidated damages hereunder. If the Seller breaches this Contract by default or otherwise, Buyer has the right to specific performance of the delivery of the Deed; provided, however, if Seller is unable without fault to deliver the Policy, or if this Contract is terminated pursuant to the provisions of Section 7.D., Buyer's sole remedy shall be to cancel this Contract, in which case Escrow Agent shall refund to Buyer the Earnest Deposit together with any accrued interest thereon. Buyer waives any right to special, consequential or lost profits damages.

11. **Seller's Warranties.** Seller represents, warrants and covenants that as of the Closing Date (and said representations, warranties and covenants shall survive the Closing for a period of six (6) months):

A. Seller has the right and capacity or the power and authority to enter into this Contract and to perform Seller's obligations under this Contract subject to the provisions of Paragraph 30 of this agreement.

B. To the best of Seller's knowledge, there is no litigation, arbitration or administrative proceedings pending or threatened concerning the Property, or pending or threatened against Seller which might have the effect of impairing the development or use of the Property.

C. The Property has public access, direct or by easement, to roadways dedicated to and accepted by the state, city or county in which the Property is located, subject to the commercial subdivision plat to be created prior to Closing.

D. To the best of the Seller's knowledge: (i) The past and present uses and conditions of the Property have not been and are not in violation of any applicable environmental laws, rules or regulations ("**Environmental Laws**"); (ii) Seller has received no notice of and is not aware of any alleged violations of Environmental Laws or any request or demand for any remedial action pursuant to Environmental Laws arising out of any past or present use or condition of the Property; (iii) There are no requirements applicable to the Property from any governmental authorities having jurisdiction requiring specific action to be taken regarding Environmental Laws in the future other than the general obligations of all real property owners to comply with and refrain from violating Environmental Laws; (iv) No portion of the Property has been (A) used as a dump site, (B) the location of above ground or underground fuel tanks, (C) used to store solvents or any other "**hazardous materials**," as these terms are generally referred under Environmental Laws, (D) treated with pesticides, herbicides, rodenticides, fertilizers or other agricultural chemicals, except in accordance with Environmental Laws, or (E) the location of septic tanks or other waste disposal facilities; (v) There has

5

not been any accidental or intentional "release" on the Property of "**hazardous waste**" or "**hazardous materials**" as these terms are generally referred under Environmental Laws.

        E.      For a period of six (6) months after the Closing, Seller shall indemnify, defend and hold harmless Buyer and Buyer's present and future directors, officers, employees and affiliates for, from and against all third (3rd) party claims, liabilities, actions, damages, judgments, environmental response and clean-up costs, fines, penalties and expenses (including without limitation reasonable attorneys' fees) which arise from or relate to Seller's breach of any of Seller's representations, warranties or covenants contained in this Section.

        12.    **Site Status**. Buyer hereby acknowledges and agrees that Seller shall not be required to perform any work (on or off site) with respect to the Property and the Buyer having right of inspection of the Property agrees it will purchase the Property, in its AS-IS physical condition as set forth in Section 15 below.

        13.    **No Seller Representations; AS-IS**. The transaction contemplated by this Agreement has been an arms length negotiation between Seller and Buyer. This Agreement reflects the mutual agreement of Seller and Buyer, and Buyer has the right to conduct its own independent examination of the Property. Other than the matters expressly represented in this Agreement and the Deed, Buyer has not relied upon and will not rely upon, either directly or indirectly, any representation or warranty of Seller or any of Seller's agents or representatives, and Buyer hereby acknowledges that no such representations or warranties have been made. Except for representations and warranties of Seller expressly contained in this Agreement and the Deed, Seller specifically disclaims, and neither Seller nor any of Seller's members, agents or affiliates is making, any representation, warranty or assurance to Buyer, and no warranties or representations of any kind or character, either express or implied, are made by Seller or relied upon by Buyer with respect to the status of title to or the maintenance, repair, condition, design or marketability of the Property, or any portion thereof, including but not limited to (a) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, (b) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, (c) any rights of Buyer to claim diminution of consideration, (d) the investment value or potential of the Property and (e) the compliance or lack thereof of the Property with governmental regulations, including without limitation, environmental laws and regulations, now existing or hereafter enacted or promulgated, it being the express intention of Seller and Buyer that, except as expressly set forth in this Agreement and the Deed hereof, the Property will be conveyed and transferred to Buyer and Buyer will accept the Property in its present condition and state of repair, "**AS-IS**" and "**WHERE-IS**", with all faults.

        14.    **Blocked Person**. Each party states to the other that neither it nor any of its affiliates is a person or entity with whom U.S. persons or entities are restricted or prohibited from doing business under any laws, orders, statutes, regulations or other governmental action relating to terrorism or money laundering (including Executive Order No. 13224 effective September 24, 2001, and regulations of the Office of Foreign Asset Control of the Department of the Treasury).

6

15. **Possession.** Possession of the Property shall be delivered to Buyer upon the Closing.

16. **Condemnation.** If any part of the Property is condemned prior to the Closing, Seller shall promptly give Buyer written notice of such condemnation and Buyer shall have the option of either applying the proceeds of any condemnation award on a pro rata basis to reduce the Purchase Price or declare this Contract terminated by delivering written notice to Seller, in which event, the Earnest Deposit, together with accrued interest thereon, shall be refunded to Buyer.

17. **Notices.** Any notice or communication required or permitted hereunder shall be deemed to be delivered, whether actually received or not, when personally delivered, transmitted by telephonic reproduction, delivered to a commercial overnight delivery service, or deposited in the United States mail, postage fully prepaid, registered or certified mail, and addressed to the intended recipient at the address on the signature page of this Contract. Any address for notice may be changed by written notice delivered as provided herein.

28. **Applicable Law.** This Contract shall be construed under and in accordance with the laws of the state of the location of the Property and all obligations of the parties created hereunder are performable in the county where the Property is located.

19. **Time of Essence.** Time is of the essence concerning all terms and conditions of this Contract.

20. **Authority and Inurement.** Each person signing this Contract has the capacity, full power and authority to enter into and consummate the transaction contemplated hereby. This Contract shall inure to the benefit of and is binding upon the parties and their beneficiaries and successors in interest.

21. **Entire Agreement.** This Contract and all attached exhibits shall constitute the entire agreement between Seller and Buyer, and shall supersede any other written or oral agreements between Seller and Buyer. This Contract may be modified only in writing signed by Seller and Buyer.

22. **Commission\Broker's Authority.** All commissions are to be paid in full by Seller to Broker at the Closing. No other fees are owed to Broker, including but not limited to, any portion of the Earnest Deposit forfeited to Seller, in the event of default by Buyer. Further, the parties hereby authorize Broker to insert over their signatures, the correct legal description or to correct the legal description if it is erroneous or incomplete, if Broker is instructed by both parties to insert or correct the legal description. Except as expressly set forth in Recital C on page 1, each party hereto hereby agrees to indemnify and hold the other harmless for, from and against any claims, costs, fees, expenses and liabilities in connection with claims to fees, commission or other compensation by any other broker or finder allegedly employed by such party or arising from such party's own acts, commitments, or agreements. This section shall survive the Closing.

7

23. **Effective Date**. Any reference to the "effective date of this Contract" or the "date of this Contract" shall refer to the date this Contract, after having been fully executed on behalf of Buyer and Seller, is received by Escrow Agent.

24. **Cancellation**. If any party elects to cancel this Contract for any reason permitted hereunder or because the Closing does not occur by the agreed date, the party electing to cancel shall deliver to the party in breach and Escrow Agent a notice stating that this Contract shall be canceled unless the breach is cured within thirteen (13) calendar days following the delivery of the notice to the Escrow Agent. If the breach is not cured within such period, this Contract may be canceled at the option of the non-breaching party giving such notice.

25. **Attorneys' Fees**. In the event of any action or proceeding brought by either party against the other pertaining to or arising out of this Contract, the prevailing party shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred on account of such action or proceeding.

26. **Severability**. A final determination by a court of competent jurisdiction that any provision of this Contract is invalid shall not affect the validity of any other provision, and any provision so determined to be invalid shall, to the extent possible, be construed to accomplish its reflected intent.

27. **Captions**. The section captions herein are for reference purposes only and are not a part of this Contract.

28. **Counterparts**. This Contract may be executed in any number of counterparts, each of which shall be considered one and the same instrument.

29. **Risk of Loss**. If there is any loss or damage to the Property between the date hereof and the Closing Date for any reason, including without limitation, by reason of fire, vandalism, flood, earthquake or act of God, the risk of loss shall be on Seller. If the cost of repairing such loss or damage would exceed ten percent (10%) of the Purchase Price, Buyer may elect to cancel this Contract unless Seller agrees in writing to pay the cost of repairing all such loss or damage.

30. **Bankruptcy Court Approval.** The sale of the Property to the Buyer is subject to Bankruptcy Court approval. The Bankruptcy Court approval process may offer the opportunity for other potential buyers to offer bids due to the public nature of the proceedings. The Bankruptcy Court approval process would not be an event of default under this agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

8

IN WITNESS WHEREOF, Buyer has executed this Contract as of the day and year set forth below.

**BUYER:**

**HEIGHTS PROPERTIES, LLP**
An Arizona limited liability partnership

By: _____  Date: 2/17, 2015
Shalom Laytin, General Partner

By: _____  Date: 2/17, 2015
Eric Laytin, General Partner

Buyer's Address:
6179 East Broadway Boulevard
Tucson, Arizona 85711

Buyer's Telephone No. (520) 512-0000
Buyer's Facsimile No. (520) 844-9274

9

## ACCEPTANCE

Seller hereby agrees to sell the Property on the terms and conditions stated herein and acknowledges the receipt of a copy hereof and authorizes Broker to deliver a signed copy to Buyer.

**IN WITNESS WHEREOF,** Seller has executed this Contract as of the day and year set forth below.

**SELLER:**

McMahon Properties, LLC,
    It's Trustee:

By: _Christopher G. Linscott_     Date: _March 20_, 2015
Name: _Christopher G. Linscott_
Its: _Chapter 11 Trustee_

By: _____     Date: _____, 2015
Name: _____
Its: _____

With a required Seller copy to

10

Receipt of Contract is hereby acknowledged
this _____ day of _____, 2015

LANDMARK TITLE ASSURANCE AGENCY


By:_____
Name:_____
Its:_____

# EXHIBIT A

## LEGAL DESCRIPTION

PTN SW4 NW4 LYG SELY TANQUE VERDE RD 2.19 AC SEC 6-14-15 Pima County Arizona

